### State of Vermont v. Glenn R. Lynds

[605 A.2d 501]

No. 88-597

Present: **Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.**

Opinion Filed October 25, 1991

Motion for Specificity On Remand Denied January 10, 1992

*M. Patricia Zimmerman,* Windsor County Deputy State's Attorney, White River Junction, for Plaintiff-Appellee.

*John J. Kennelly* of *Carroll, George & Pratt,* Rutland, for Defendant-Appellant.

*Jeffrey L. Amestoy,* Attorney General, and *Susan R. Harritt,* Assistant Attorney General, Montpelier, for amicus curiae Office of Attorney General.

*E.M. Allen,* Defender General, and *Henry Hinton,* Appellate Attorney, Montpelier, for amicus curiae Office of Defender General.

**Dooley, J.** In this appeal from a conviction for sexual assault, we hold that the trial court erred in ruling that the prosecution's expert witness was unavailable under V.R.Cr.P. 15 and in allowing her deposition to be read to the jury. Since the error was not harmless, we reverse and remand for a new trial. Ac-

cordingly, we do not reach two other arguments raised by defendant.

In February 1988, defendant's nineteen-year-old daughter complained that she had been repeatedly sexually abused by defendant. She alleged that the abuse began when she was thirteen and continued for more than three years, with the last incident occurring in September of 1985 when she was seventeen.

In June 1988, the State retained Dr. Anna Salter, a clinical psychologist specializing in child sexual abuse, to testify as an expert witness on the issues of delayed reporting, family dynamics of sexual abuse, patterns of sexual abuse and effects of sexual abuse. At the time she was retained, the State advised her that trial was scheduled for late September 1988. After the State disclosed that it had retained Doctor Salter, the defendant took her deposition on July 28, 1988.

By early August, the parties were notified that trial was set for September 28. On August 10, the State wrote to Dr. Salter advising her of the trial date. Thereafter, the State telephoned her on September 13 and September 23, leaving messages each time but failing to reach her personally. Finally, on September 26, the State established telephone contact with Dr. Salter and learned that she would be in Wisconsin on the date of trial and would not be returning until October 3, 1988.

■ On September 27, the day before trial, the State motioned the trial court to declare Dr. Salter "unavailable" and admit her deposition testimony. Once a witness is found unavailable, her deposition may be used as substantive evidence. V.R.E. 804(b)(1); V.R.Cr.P. 15(e). The court granted the State's motion over defendant's objection that the witness was not unavailable under the rules of evidence and procedure and the admission of the deposition denied his right to confront the witness. An edited version of the deposition was read to the jury.

■ Defendant argues that the trial court erroneously declared Dr. Salter "unavailable" thereby depriving him of his constitutional rights to confront and cross-examine a witness whose testimony was offered against him. A witness is unavailable if she is "absent from the hearing and the proponent of [her] statement has been unable to procure [her] attendance . . . by process or other reasonable means." V.R.E. 804(a)(5); V.R.Cr.P.

15(g). The issue is whether the language of V.R.Cr.P. 15(g) and V.R.E. 804(a)(5), "other reasonable means," requires the State to do more to secure the witness's attendance than it did here.

It is important to emphasize that we are dealing with a requirement imposed both by the applicable evidence rule and by the Confrontation Clause of the Sixth Amendment to the United States Constitution. The requirements are similar when a party seeks to admit the prior testimony of a witness in place of present testimony in a proceeding. See *State v. Carroll*, 147 Vt. 108, 111, 513 A.2d 1159, 1160 (1986) (hearsay rules and confrontation clause protect similar values). Thus, to meet confrontation requirements, the witness must be unavailable despite the State having made "a good-faith effort to obtain his presence at trial." *Barber v. Page*, 390 U.S. 719, 725 (1968), *quoted in Carroll*, 147 Vt. at 112, 513 A.2d at 1161.

The length to which the State must go in producing a witness is a "question of reasonableness." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980); see also *United States v. Casamento*, 887 F.2d 1141, 1169 (2d Cir. 1989). The State bears the burden of establishing the witness's unavailability. *Ohio v. Roberts*, 448 U.S. at 74–75.

The State's only efforts to secure Dr. Salter's presence were an initial letter followed by several phone calls. The State failed to reach her until it was too late to use alternative measures to assure her attendance. It argues that the phone calls satisfied the mandate that the State use "other reasonable means."

Because the State knew where its witness was, "rules governing unavailability . . . are not strictly applicable." *Carroll*, 147 Vt. at 113, 513 A.2d at 1161–62. Furthermore, a witness who will be inconvenienced by appearing, *Topping v. People*, 793 P.2d 1168, 1171 (Colo. 1990), or proves evasive, *United States v. Lynch*, 499 F.2d 1011, 1024 (D.C. Cir. 1974), is not unavailable.

The State elected not to seek a continuance of a few days to accommodate Dr. Salter's schedule or to invoke the Uniform Act to Secure the Attendance of Witnesses, 13 V.S.A. § 6646. The fact that the State limited its effort because it assumed that Dr. Salter would testify is not a valid excuse. The State's effort

was not sufficiently diligent to satisfy the unavailability requirement. The trial court erred in admitting the deposition.

■■ The State argues, however, that any error resulting from the admission of Dr. Salter's deposition was harmless. Because of the constitutional violation, we must use the standard applicable to a constitutional error to determine whether the error was harmless. To avoid reversal, we must find that the error was harmless beyond a reasonable doubt. See *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). The standard applies in confrontation clause cases involving an expert witness. See *Satterwhite v. Texas*, 486 U.S. 249, 258 (1988). Under this standard, an error cannot be harmless "[i]f there remains a possibility that the constitutionally-proscribed evidence impacted on the ultimate decisional process of the jury [and] . . . the beneficiary of the error cannot refute that possibility beyond all reasonable doubt." *Brown v. Dugger*, 831 F.2d 1547, 1554 (11th Cir. 1987); see also *Chapman v. California*, 386 U.S. 18, 24 (1967) (adopting language of *Fahy v. Connecticut*, 375 U.S. 85, 86–87 (1963), that error is not harmless if "there is a reasonable possibility that the evidence complained of might have contributed to the conviction"). The State has the burden of demonstrating harmlessness. See *Arizona v. Fulminante*, — U.S. —, —, 111 S. Ct. 1246, 1257 (1991).

■ The error here was in admitting the deposition testimony of the expert witness. To determine whether the error is harmless, we must posit a trial without any evidence by Dr. Salter. In making this assessment, we must consider a number of factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. at 684.

All of the *Van Arsdall* factors show that the admission of the evidence here was not harmless. The State put on only one witness, the victim, in its case in chief. The victim testified that defendant had sexually assaulted her over a four-year period. Defendant took the stand and denied the charge and the specific events testified to by the victim. He was supported by each of

the victim's three brothers. They testified that they observed nothing unusual during the period covered by the victim's testimony and that the house lacked privacy. The trial was a credibility contest between the defendant and the victim with the defendant having the advantages of the presumption of innocence, the State's high burden of proof and the supporting testimony. We cannot say that the State had a particularly strong case. See *Clark v. O'Leary*, 852 F.2d 999, 1005 (7th Cir. 1988) (evidence must be overwhelming for error to be harmless); *Burns v. Clusen*, 798 F.2d 931, 943 (7th Cir. 1986).

There was no other evidence corroborating or contradicting the expert's testimony and the testimony was not cumulative. There was no real opportunity for cross-examination because there is no indication what the direct testimony would have been. Although all the discovery questions were asked by the defendant, they were merely explorations of what the witness *might* testify to rather than cross-examination based on what the witness would actually testify to.

The expert testimony was very important in this case. The expert testified not only that victims of sexual abuse often delay reporting the abuse, but also to some of the reasons why a victim fails to report the abuse. She testified that in many cases of parental sexual abuse, the child was not close to the mother, and stated "[a]ll of that seems to correlate with abuse occurring as though it simply makes it more possible for the abuse to occur." In closing argument, the State argued that the victim fit the expert's profile: she had not reported the abuse because she feared she would not be believed, and she was not close to her mother. Thus, the evidence rebutted one of the reasons to disbelieve the victim, the failure to report the abuse at or near the time it occurred, and established a partial profile from which the State could argue to the jury. See B. Morosco, The Prosecution and Defense of Sex Crimes § 9.08, at 9–49 (1991).

We first allowed profile evidence on delay in reporting allegations of sexual abuse in *State v. Hicks*, 148 Vt. 459, 462, 535 A.2d 776, 777 (1987), because "[t]he behavioral patterns of child victims of sexual abuse are generally not known to the average juror and are therefore a proper subject for expert testimony." This was an application of the earlier holding in *State v. Catsam*, 148 Vt. 366, 369, 534 A.2d 184, 187 (1987), that admitted

this type of evidence because the "unique psychological effects of sexual assault on children place the average juror at a disadvantage in understanding the behavior of the victim." These holdings were a break from past precedent that had viewed profile evidence with suspicion. Following the rationales for the *Hicks* and *Catsam* cases, we view the expert testimony as important to enable the jury to properly weigh the victim's testimony.

██ Since we cannot say that the admission of the expert testimony was harmless, we must reverse and remand for a new trial.

*Reversed and remanded.*

**Morse, J.,** dissenting. I respectfully dissent because I conclude that the error here was harmless beyond a reasonable doubt. Dr. Salter's testimony, in my view, was so unimportant to the State's case that it made no difference to the outcome of the trial. In other words, the verdict would have been guilty even if her testimony had been excluded. See *Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986) ("importance of the witness' testimony in the prosecution's case" a critical factor in assessing harmless error).

The victim, an adult when she testified at trial, related that defendant had sexually assaulted her on a regular basis beginning when she was thirteen and ending nearly four years later. Although the sexual abuse began as inappropriate touching and kissing, the victim testified that intercourse began when she was fourteen. Her father told her not to tell anyone and she did not. The victim experienced fears of pregnancy, but defendant assured her that he could not father a child. During that time, she lived with defendant and brothers, cooked the meals and did the housework, with her brothers offering sporadic assistance.

The victim's mother lived at home for a few months a year. Each spring, the parents would separate, and the mother would move out. The assaults allegedly took place upstairs in both her and defendant's bedrooms while her brothers were asleep. She stated that defendant's bedroom had a door, and her bedroom did not, but the opening was covered with a blanket. She main-

tained that the last incident—the incident for which defendant was charged—occurred when she and defendant were home alone.

The victim said that she had not come forward earlier because she feared no one would believe her. She decided to report the abuse because defendant was dating a woman who had a fifteen-year-old daughter and she was afraid the same thing would happen to the daughter. She claimed she had not moved in with her mother because her parents had decided that once the children were in high school they should remain with defendant in order to spend all four years in the same school.

Defendant took the stand and denied the abuse occurred. The core of defendant's case was that it would have been impossible for the pattern of abuse to have occurred without someone else in the house knowing about it. His three sons testified that other family members had bedrooms upstairs and that a portion of defendant's home was unfinished, doors were missing, and the walls consisted of studs and plywood. They testified that there had been no outward signs of any problem, and that all the family members were under the impression that defendant and the victim had a "normal father-daughter relationship." Defendant claimed that on several occasions the victim had the opportunity to move out of defendant's house and live with her mother and chose not to.

The defense attempted to rebut the victim's reason for belatedly accusing her father of abusing her—protection of the fifteen-year-old daughter of defendant's companion—by calling an investigator from the state's attorney's office. The investigator testified that he did not investigate the situation between defendant and the fifteen-year-old. In the course of his testimony, the investigator said it was common for victims to come forward with allegations of sexual abuse to protect potential victims.

In his closing, defendant's counsel argued that the victim's story was implausible and emphasized that the investigator did not take the victim's fear for the safety of the fifteen-year-old seriously, asking the jury, "What does that tell you?" Defendant's counsel stressed that she remained in her father's house and had "never said a word for the four years she claims these assaults took place."

The testimony of the expert, Dr. Salter, covered eleven transcript pages. She gave her credentials and title (assistant professor of clinical psychiatry and maternal and child health at Dartmouth) and stated her specialty was "child maltreatment." She gave the background of her involvement with the case. The State had provided her with a case history of the victim, whom she had never met.

Dr. Salter then discussed delayed reporting of sexual abuse. She stated that there were numerous studies on this phenomenon and named a few of them. She stated that only a low percentage of victims ever reported abuse (5% told the police; 70% never told anyone) and that she was not aware of any research on the average length of delay in reporting. Then she was asked to explain the dynamics of delayed reporting.

EXPERT: Most children don't tell at all. Sometimes that's because an offender threatens them or manipulates them, and I've heard this from both sides, from the victims and the offenders. . . . [T]hey will tell kids that they will kill their mother. They will tell kids that no one will believe them. They will tell kids that you asked me to do those things. How would you like people to know. . . . So, they [employ] either direct threats or some sort of manipulation in order to insure the child's silence. . . . [T]here seems to be some psychological mechanism whereby kids just shut down, close it in, seal it off. Some become amnesiac.

. . . .

COUNSEL: Is there a reason why this supposedly occurs?

EXPERT: . . . We can all guess as to why they don't tell. One of the guesses is that they are egocentric, and they believe something is wrong. That it is their fault. . . . Children often doubt that they will be believed in comparison to an adult. Children get the

message somehow or the other that they are not supposed to tell. They don't really understand why, but they obey their parents out of practice and fear of the consequences. So, that that's all speculation as to why they don't tell. The truth is, . . . in a phenomenal number of studies, the majority of the kids simply just don't tell.

. . . .

COUNSEL: And assuming that there are two parents in the situations, what is it about the dynamics that precludes, prevents the child from reporting to the other parent who also exercises the same kind of influence?

EXPERT: Often, and I won't say this is true in every case, but in many cases that parent is either absent or incapacitated, extremely passive, dependent on the abusive parent in some way. The child may not have a close relationship with the mother. I have known some offenders who are very clever with driving a wedge between the two, mother and the child, so that there wasn't any close relationship. . . . What I am not saying is that that's true in every case.

COUNSEL: It appears from what you've told me in all of your answers there is really no scientific basis, at least for delayed reporting, hasn't been reduced to a science, would that be a fair statement?

EXPERT: No. The only thing that you've asked me that I would agree about that on is the reasons for the delayed reporting. But delayed reporting is a very established fact that can be backed up by lots of studies that it occurs.

COUNSEL: So . . . you can give testimony with respect to a . . . percentage . . . that might delay in reporting or the fact that delayed report-

EXPERT: ing often occurs, but it's the reason for the delayed reporting that you—

EXPERT: ... that I say are speculation. You will read a lot of authors who give you the truth. The truth is . . . they are guessing about why children do this. And I'm sure some of the guesses are accurate, but what we do have to add on is the fact that they do do it.

COUNSEL: Dr. Salter, with respect to your testimony in delayed reporting, do you have to accept as true the allegations in order to give that kind of testimony?

EXPERT: No.

COUNSEL: What about with regard to the family dynamics of sexual abuse? Again, do you have to accept the truth of the allegations before you can give testimony with respect to any of the facts of this case?

EXPERT: No. As I understand it, I am being asked, for example, whether delayed reporting is or isn't common. I don't have to accept or really know very much about the reporting in this specific case to answer that question.

The import of Dr. Salter's testimony was that, in general, sexually abused children either do not report the abuse at all or delay reporting it for a significant period of time. She explicitly stated that she was not accepting the truth of the allegation in this case and was merely relating what studies had shown about "whether delayed reporting is or isn't common."

This narrow type of expert testimony concerning general behavior of victims, offered by someone who has not interviewed the victim, is considered to pose the least danger of improperly influencing the jury. See *State v. Wetherbee*, 156 Vt. 425, 432–33, 594 A.2d 390, 394 (1991). Dr. Salter did not describe her understanding of the profile of a sexually abused child. See *State v. Gokey*, 154 Vt. 129, 131, 574 A.2d 766, 767 (1990) (physical symptoms such as headaches, vomiting, and nausea; behavioral

symptoms, such as secretiveness, worry, anxiousness, low self-esteem, poor concentration, day dreaming, poor school work, acting out, and difficultly relating to other children). The only symptom described by Dr. Salter which could be said to be consistent with sexual child abuse is the tendency of many victims to delay reporting or not to report at all.

Further, the psychologist gave her opinion that the reasons for delayed or lack of reporting are speculative in any particular case. She opined, "We can all guess as to why they don't tell. . . . And I'm sure some of the guesses are accurate . . . ." In a nutshell, the probative value of this testimony was that studies demonstrate that delay in or absence of reporting by sexually abused children "is a very established fact," a not-so-surprising proposition.

The specific issue on which Dr. Salter offered testimony—commonness of the phenomenon of reporting delay—is generally accepted in the field of psychology, see, e.g., Myers, Bays, Becker, Berliner, Corwin & Saywitz, *Expert Testimony in Child Sexual Abuse Litigation*, 68 Neb. L. Rev. 1, 52 (1989), and I submit supported by common sense. Understandably, defendant did not call an expert to the stand to rebut Dr. Salter's testimony, nor has he brought forth any grounds for disputing her testimony or suggested how he would have challenged it at trial had she testified in person.

Cross-examination of this witness would not undermine the probative force of her opinion that reasons for delayed reporting are "guesswork." Her testimony on why abused children delay reporting was exclusively in the realm of common knowledge. I suggest that offender threats and psychological manipulation, the egocentricity of children, their blind obedience to parental authority, and imbalance in parental capacity—all given as general reasons for delayed reporting—are subjects properly commented upon in argument.

We have stated that "[t]he unique psychological effects of sexual assault on children place the average juror at a disadvantage in understanding the behavior of the victim." *State v. Catsam*, 148 Vt. 366, 369, 534 A.2d 184, 187 (1987). It does not follow, however, that everything to which an expert testifies in this area is outside the realm of common understanding. The witness's status as an expert did not transform the facts to

which she testified into information beyond the understanding of the lay person. An adolescent's failure to disclose the sexual abuse which her father committed because she was warned not to tell and because she assumed no one would believe her is a matter within the jury's ordinary human experience. See *Canas v. Maryland Cas. Co.*, 236 Neb. 164, 172, 459 N.W.2d 533, 539 (1990) (The test for the necessity of expert opinion is whether "'the particular issue can be determined from the evidence presented and the common knowledge and usual experience' of the fact finders.").

I do not suggest that delay in reporting should never be a subject on which an expert's opinion is permitted. V.R.E. 702 (when "specialized knowledge will assist the trier of fact to understand the evidence," an expert may give an opinion). It is within the trial court's discretion to admit this evidence. I agree that in this case the need for it was at best minimal, and it probably should not have been admitted. My conclusion as to its inadmissibility is based not on the probative impact of the evidence, but on the lack thereof. By its very nature, the testimony did not boost the State's case enough to have made any difference.

The expert's ambivalence in many ways undermined the force her opinions might otherwise have had, which was dubious at best. She testified that she had no knowledge about studies on the length of delay in disclosure and that she and those in her field can only speculate as to the reasons for delay because they have no data to support their theories. The expert never opined that these speculative reasons for delayed reporting were applicable to this case. From her testimony, the jury was asked to glean only that it was possible for many reasons to cause delay in reporting, as opposed to the single reason offered by defendant—that the abuse never happened. I do not read the prosecutor's argument to the jury as claiming more from Dr. Salter's testimony than it deserved had she not testified at all.

The information which the expert related was not relevant to defendant's guilt nor did it suggest that the victim was truthful. Cf. *State v. Wetherbee*, 156 Vt. at 431–34, 594 A.2d at 393–95 (mental health professional who has examined the victim and then testifies as the State's expert at trial may be perceived by

jury as vouching for victim's credibility). The only impact of Dr. Salter's testimony, and the only purpose for which it was used, was to dispel any stereotypic bias that children who delay reporting of alleged abuse must be lying. See *Gokey*, 154 Vt. at 133–34, 574 A.2d at 768.

This case was to be won or lost on the strength of the victim's testimony in relation to that of defendant and his three sons. The defense focused primarily on the unlikelihood that years of sex between father and daughter could have happened without the sons having heard at least some of it. The defense particularly attacked the victim's reason for coming forward at such a late date. The defense argued that the victim's stated motive, protection of the fifteen-year-old, was weak and not believed by the investigator, who did not take her fear seriously enough to investigate. It is noteworthy that it was not Dr. Salter who proposed protection of a potential victim as a reason for delay in reporting. It was the victim herself. Defendant's attack on victim's motive, however, left this key question begging an answer. If not to protect the fifteen-year-old, why did the victim accuse her father? The defense had no theory on motive. Counsel told the jury in final argument, "I predict, however, the State will say, well, why would [the victim] go through this if it weren't true. And the answer is, we don't know why."

Dr. Salter's testimony had no bearing on the victim's motive to report, which I believe was the crux of this case. Dr. Salter's recitations were harmless window dressing, sufficiently remote from the critical issues so as not to affect the verdict. The majority simply gives the jury too little credit to understand the nature of what Dr. Salter actually said.

Defendant also argues that the court erred in allowing evidence of "prior bad acts"—defendant's similar attacks on the victim committed over a three-year period preceding the charged incident. Admission of this evidence is a matter of discretion, which was not abused in this case. Sexual abuse of a child by a parent rarely occurs as an isolated incident. Rather, incest is a condition in a dysfunctional family usually consisting of a routine pattern of repeated abuse. Juries are not ignorant of the phenomenon of incest. The trial court properly determined that the prior bad acts were relevant under V.R.E. 404(b) and not unfairly prejudicial under V.R.E. 403, and it gave a lim-

iting instruction. See *State v. Cardinal*, 155 Vt. 411, 414, 584 A.2d 1152, 1154 (1990).

I would affirm, and have been authorized by Justice Peck to say that he would do the same.

## On Motion for Specificity On Remand

**Dooley, J.** On October 25, 1991, this Court reversed defendant's conviction for sexual assault because of error in allowing the State's expert witness to testify by deposition without being present. We remanded the case to district court for a new trial. Following the issuance of the opinion, the State moved that we clarify the mandate to specify that "the remand goes back to the time of trial and not back to the time the charges were filed."

In oral argument, the State clarified that its motion was intended to prevent defendant from engaging in any further pretrial discovery or filing any pretrial motions.[1] The State had no reason to believe that defendant intended to engage in further discovery or motion practice. Nor did it state any reasons specific to this case why such defense activity should be prohibited. Instead it argued, without citation to any authority, that such pretrial motion practice or discovery is prohibited in other states when there is a reversal and a new trial ordered because of errors that occurred at trial. Again, without citation to any authority, it argues that Vermont's rule is different. It urges us to change Vermont's rule, for the purpose of this case, by a specific remand direction.

The State's assertion of Vermont law on this question is erroneous, because we have never ruled on the nature of criminal

---

[1] We invited the Attorney General to provide his views on this motion, and he filed a brief amicus curiae in support of the motion. His position was, however, different from that of the Windsor County State's Attorney because he would allow a defendant to engage in further pretrial activity on a showing of good cause.

The Defender General was also invited to submit an amicus curiae brief and did so. He took the position that the motion should be denied because the trial court has adequate power to control pretrial proceedings.

proceedings following a remand.[2] The State's representation of the law in other jurisdictions is also erroneous. The rule we apply, which is applicable in most, if not all, other jurisdictions was recently detailed by the California Supreme Court:

> [Reversal and remand for a new trial] even permits amendment of the accusatory pleading . . . as well as renewal and reconsideration of pretrial motions and objections to the admission of evidence. . . . Absent a statutory provision precluding relitigation, a stipulation by the parties, or an order by the court that prior rulings made in the prior trial will be binding at the new trial, objections must be made to the admission of evidence . . . , and the court must consider the admissibility of that evidence at the time it is offered. (Citations omitted.)

*People v. Mattson*, 50 Cal. 3d 826, 849–50, 789 P.2d 983, 999, 268 Cal. Rptr. 802, 818 (1990); see also *Gillie v. State*, 512 N.E.2d 145, 148 (Ind. 1987) (reversal and remand acts to "place the parties in the position that they would have occupied if no proceedings on the charges had ever occurred"); *People v. Cheatham*, 135 Mich. App. 620, 623, 354 N.W.2d 282, 284 (1984) (reversal and remand nullified State's amendment of the information); *West v. State*, 519 So. 2d 418, 425 (Miss. 1988) (motion to suppress based on additional evidence must be heard following reversal and remand); *State v. Wines*, 65 N.J. Super. 262, 270, 167 A.2d 650, 655 (1961) (trial court had the same power over the conduct of the case following reversal and remand "as when it was first handed up by the grand jury"). The same rule applies in the federal courts. See *United States v. Lee*, 539 F.2d 606, 610 (6th Cir. 1976) (following reversal and remand, defendant could withdraw waiver of jury trial and require that case be heard by a jury); see also 5 L. Orfield, Criminal Procedure under the Federal Rules § 33:60, at 363 (2d ed. 1987) ("parties are returned to their original positions"). In *Mattson*, the court re-

---

[2] We have ruled in a civil case that "[w]hen a verdict is set aside and a new trial granted, the whole adjudication of the first is wiped out, and the case proceeds *de novo*." *Enos v. Owens Slate Co.*, 107 Vt. 125, 128, 176 A. 121, 122–23 (1935). Even if this were a criminal case, *Enos* would give us little guidance since the issue was whether the grant of a motion for judgment notwithstanding the verdict at the end of the first trial became the law of the case and prevented a second trial.

versed the first conviction because it found that the trial court improperly admitted a confession in violation of the self-incrimination privilege of California's constitution. Despite this ruling, the court affirmed the introduction of the confession at the second trial because the State offered new evidence at a pretrial hearing to show that defendant initiated the interviews at which he confessed. 50 Cal. 3d at 852, 789 P.2d at 1001, 268 Cal. Rptr. at 820.

Although the State is incorrect that other jurisdictions follow the rigid position it espouses here, most jurisdictions give the trial court some discretion to prevent duplicative and repetitive proceedings. Under California law, for example, the trial court has the discretion to deny motions that were decided adversely to the party prior to the appeal in the absence of a "showing of any change of circumstance[s] necessitating renewal of these motions at the second trial." *People v. Dorsey*, 34 Cal. App. 3d 70, 73, 109 Cal. Rptr. 712, 714 (1973). See also, e.g., *Bailey v. State*, 521 A.2d 1069, 1093 (Del. 1987) (trial court may allow pretrial rulings made prior to reversal and remand to stand unless they were "*clearly in error* or there has been an important change in circumstance[s]") (emphasis in original); *Commonwealth v. Martin*, 392 Mass. 161, 164, 466 N.E.2d 76, 78 (1984) (trial court has discretion to decide whether to reconsider ruling made on admission of polygraph evidence at earlier trial); *State v. Reldan*, 100 N.J. 187, 205–06, 495 A.2d 76, 86 (1985) (whether ruling on motion to suppress at earlier trial has become the law of the case lies within discretion of the trial court to be exercised based on certain specified factors); *People v. Hults*, 150 A.D.2d 726, 727, 542 N.Y.S.2d 18, 19 (1989) (trial court has discretion whether to reopen a suppression motion following a reversal and remand).

 Although we have not ruled directly on the extent of trial court control over pretrial proceedings following a reversal and remand, decisions in analogous circumstances provide some guidance. We have required defendants to raise pretrial issues anew when the trial is held before a judge different from the one who decided pretrial motions, *State v. Senecal*, 145 Vt. 554, 558, 497 A.2d 349, 351 (1985), and we have also emphasized that review of every pretrial issue "would be counterproductive and a waste of judicial resources." *State v. Zumbo*, 157 Vt. 589,

591, 601 A.2d 986, 987 (1991). Thus, the trial court is given discretion on whether to review a pretrial ruling with the understanding that reconsideration is the exception, not the rule. See *State v. Bruno*, 157 Vt. 6, 8 n.1, 595 A.2d 272, 274 n.1 (1991). Consistent with this view, we recently held that it was error for the trial judge to reconsider a pretrial ruling granting a motion to suppress in the absence of new evidence or similar circumstances. *State v. Blow*, 157 Vt. 513, 516, 602 A.2d 552, 554 (1991). We conclude that these principles apply equally when a new trial is ordered.

We emphasize that the cases from other states involve trial court discretion and not appellate court remand orders. Indeed, we can find no case in which an appellate court has issued the kind of remand order the State seeks here, at least in the absence of any compelling need arising out of the circumstances of the case before the court. In the absence of any information from the parties, we do not know whether defendant will seek to renew any pretrial orders or to engage in further discovery. We do not know whether there will be any witnesses in addition to those who testified at the first trial or whether there is likely to be any change in the testimony of those who did testify. Even if we had the necessary information, it would be foolhardy and unnecessary for us to act like a trial court to supervise the movement of this case to the new trial.

If we were to grant this type of motion, we would run the risk that the party that is ready to proceed immediately to retrial would move to prohibit further pretrial events in cases where it is inappropriate to do so. We prefer not to lock in an unwarranted tactical advantage for either side, especially when we would do so without knowledge of the nature and extent of that advantage and its prejudice to the other party.

We believe that the trial court has adequate discretion to prevent repetitive, unnecessary or harassing motion practice prior to the new trial. For example, recent criminal procedure rule amendments give the court specific power to do so in the area of depositions. See V.R.Cr.P. 15(e), (f).

*Motion for specificity on remand denied.*