### State of Vermont v. Robert Plante

[668 A.2d 674]

No. 94-053

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed November 3, 1995

*Jeffrey L. Amestoy*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Charles S. Martin* of *Martin & Paolini*, Barre, for Defendant-Appellant.

**Allen, C.J.** Defendant Robert Plante appeals his felony-murder conviction following a jury trial. We affirm.

On May 31, 1992, Glenn Michelson and Steven Zargo hosted a Memorial Day party at Michelson's residence on Baker Brook Road near Williamsville, Vermont. Defendant met Michelson for the first time at a mutual friend's house that afternoon, and Michelson invited

defendant to the party. Defendant's behavior while at the party was abrupt and confrontational. He made unwanted advances toward a woman at the party, ridiculed and challenged a stroke victim because of his inability to use one of his arms, and attempted to take without permission Michelson's car, leather jacket, and keg of beer. Michelson intervened in most of these instances.

At eleven o'clock, the only people remaining were defendant, Michelson, Zargo, Christopher Lapan, William Dorton, and Bart Stacey, who was upstairs asleep. At approximately 11:30 p.m., Zargo, Lapan, and Dorton decided to go to a pub in town. These three told defendant he could not go along because he had no money. Defendant again attempted to drive away in Michelson's car without permission. Michelson took the keys away from him and went back into the house. Defendant then started walking down the driveway.

A neighbor of Michelson's watched three people depart from Michelson's home at about 11:30 p.m. Shortly thereafter, he heard loud and argumentative voices coming from the house, and a few moments later saw Michelson's car speeding down Baker Brook Road. Another neighbor heard and saw much the same events.

Shortly before midnight, Robert and Kathleen Salzman, who live about a mile down Baker Brook Road, heard a car skid and crash in front of their house. Mr. Salzman went to see what had happened and encountered defendant walking towards him. After a brief exchange, defendant became excited and unruly. Salzman returned to his house and called the state police. Before the police arrived, defendant smashed through a window on Salzman's porch. At that point, Salzman removed defendant from the porch. Defendant then left the Salzman home.

Shortly thereafter, the police arrived at Salzman's and began searching for defendant in the surrounding area. At about the same time, Zargo, Lapan, and Dorton returned to the Michelson residence. When they entered, they discovered Michelson's body in the hallway with a ski pole impaled in his neck. They called the police and went upstairs to see if Stacey had met the same fate. The police, who were still at the Salzman residence, responded to the call from the Michelson residence. Upon entering Michelson's house, the police discovered Michelson in the hallway lying in a pool of blood. Next to him lay defendant's shoes. In addition, they found two knives in the kitchen sink, a meat cleaver in one of the closets, and a knife stuck in the wall.

The police then resumed their search for defendant and found him lying in the woods by Baker Brook Road near the Salzman home. He

was apprehended and found to be wearing Michelson's boots and leather jacket. In addition, there was blood on his hands and clothing.

The state police laboratory conducted blood-typing analyses on blood samples taken from the scene and from defendant's clothing, and from Michelson, Zargo, and defendant. The analyses reported the type of blood in each sample, and screened for erythrocytes, acid, and phosphatase (EAP). EAP testing shows genetic "fingerprints" in blood, and provides greater accuracy than simple typing alone. The tests were performed between June 1992 and October 12, 1992. The results of these tests indicated that the blood found on clothing worn by defendant matched that of the deceased.

The State's chemist who performed these tests and testified at trial about the results was discharged several months after the tests were completed when drugs were discovered missing from the police laboratory and hair sampling indicated his usage of the missing drugs. The chemist had, by the time of trial, accepted a plea bargain and received a deferred sentence for possession of Fentanyl on October 21, 1992.

A jury convicted defendant of felony murder, unlawful trespass, simple assault, and unlawful mischief. On appeal, defendant raises three issues. First, he challenges the district court's refusal to allow him to cross-examine the State's chemist after the chemist invoked his Fifth Amendment self-incrimination privilege. Second, he challenges the admission of a statement allegedly made by him on the grounds that it violates V.R.E. 403 and V.R.E. 404(b). Third, he contends that the district court committed plain error when it instructed the jury on the necessary mental state required for the intent element of felony murder.

## I.

Defendant argues that the district court's refusal to allow him to cross-examine the chemist violated his right to confrontation. He contends that the district court should have allowed the cross-examination because (1) the chemist's plea agreement had removed the threat of self-incrimination, (2) the court could have granted the chemist immunity, and (3) the exclusionary rule protects the chemist from having any testimony used against him in future criminal proceedings.

The privilege against self-incrimination allows a witness to refuse to testify where the testimony could be used as evidence in subsequent prosecutions. *Heaton Hosp., Inc. v. Emrick*, 128 Vt. 405, 407,

264 A.2d 806, 808 (1970). Once the threat of prosecution has been removed or the proceedings have been resolved, however, compelling a witness to disclose information concerning the resolved proceedings does not violate the self-incrimination privilege. *State v. Couture*, 146 Vt. 268, 273-74, 502 A.2d 846, 850 (1985). The chemist asserted this privilege when questioned by defendant regarding whether he had been "ingesting Fentanyl, smoking or snorting heroin, and taking Dexatrins" during the time that he was conducting blood analyses for this case. Defendant contends that, because the chemist had already accepted a deferred sentence for his conviction of possession of Fentanyl, the danger of prosecution no longer existed and the self-incrimination privilege did not apply.

█ The chemist received a deferred sentence for possession of Fentanyl on October 21, 1992. The questions to which defendant sought answers, however, went to the chemist's drug use during the time period between May and September of 1992. The conviction for possession on October 21, 1992, in no way precluded prosecution for possession or use of drugs at other times. Because the acts for which the chemist pled guilty and the acts inquired into by defendant were completely separate, the threat of prosecution had not been removed. The district court did not err by allowing the chemist to invoke the self-incrimination privilege.

██ Defendant next argues that the witness should have been granted immunity. He argues for this on two grounds. First, he contends that a court has the inherent power to grant immunity to a witness where, without such immunity, the defendant is prevented from presenting evidence that is "clearly exculpatory" and "crucial to his case," or where the State's refusal to grant immunity is a deliberate attempt to distort the fact-finding process. *State v. Hamlin*, 146 Vt. 97, 107-08, 499 A.2d 45, 53 (1985). Defendant has not shown that the evidence sought from the chemist would be "clearly exculpatory" or "crucial to his case," or that the State deliberately attempted to distort the fact-finding process. In fact, the information sought by defendant was obtained from another witness, Sergeant Timothy Bombardier, who testified that the chemist had admitted to using Fentanyl and heroin during the time period between June 20, 1992 and December 4, 1992. Because no information was kept from the jury as a result of the district court's refusal to grant immunity, defendant cannot claim that he was prevented from presenting any evidence that was exculpatory or crucial to his case.

In his second argument for immunity, defendant asks us to construe 12 V.S.A. § 1664 to permit the defense to request immunity just as the prosecution is now able to do. We reject the invitation to reach this argument because defendant did not raise it with the district court. See *In re Johnston*, 145 Vt. 318, 321, 488 A.2d 750, 752 (1985) ("Issues not raised below will not ordinarily be considered when presented for the first time on appeal."). For the same reason, we decline to address defendant's argument seeking to apply the exclusionary rule announced in *State v. Begins*, 147 Vt. 295, 299-300, 514 A.2d 719, 722-23 (1986) (probationer asserting self-incrimination privilege may be compelled to testify, but testimony and its fruits may not be used against him in subsequent criminal proceeding).

## II.

Defendant challenges as a violation of V.R.E. 404(b) the admission of testimony about a statement made by defendant during the evening of the murder. A witness testified that defendant said to a group of women at the party that he was "on parole for killing a woman down in Florida, or Bradford." The prosecution offered this evidence to establish defendant's state of mind on the day of the murder. Defendant argues that the district court erred in admitting the evidence because it was improper character evidence showing a propensity to commit a similar crime and because its prejudicial impact clearly outweighs its probative value. While we are not convinced that admission of this testimony was erroneous, we conclude that any error was harmless.

Any error which does not affect substantial rights shall be disregarded. V.R.Cr.P. 52(a). In determining whether an error is harmless, we must posit a trial without the contested evidence. *State v. Lynds*, 158 Vt. 37, 42, 605 A.2d 501, 503 (1991). Factors we consider in our analysis include the importance of the evidence to the prosecution's case, whether the evidence was cumulative, and the overall strength of the prosecution's case. *State v. Streich*, 163 Vt. 331, 346, 658 A.2d 38, 49 (1995). The burden is on the State to show the error was harmless. *Lynds*, 158 Vt. at 42, 605 A.2d at 503.

Overall, the State's case against defendant was strong and thorough. The police discovered defendant lying in the woods near the scene after he drove the victim's car into a ditch. Defendant was wearing the victim's jacket and boots, and the police found defendant's own shoes in a pool of blood next to the victim's body. Defendant's hands, boots, and clothing all had blood on them which

matched that of the victim. Police identified defendant's palmprint on the shaft of the ski pole implanted in the victim's neck and defendant's bootprint in a pool of the victim's blood. Defendant behaved in a confrontational manner throughout the afternoon preceding the murder, and on several occasions the victim curtailed defendant's aggression. The only person to whom defendant pointed as the alternative murderer left the scene with two other persons before a neighbor heard argumentative voices emanating from the victim's house. Defendant's conduct at the Salzman residence was not consistent with his claim that he had just happened upon the victim's body by accident.

The evidence brought to bear against defendant was overwhelming. The admission of the contested evidence to show defendant's state of mind was cumulative and not critically important. A trial without the contested evidence would have yielded the same result.

## III.

The final issue raised on appeal is whether the district court committed plain error when it gave instructions to the jury regarding the element of intent necessary for felony murder. Although defendant failed to object to the instructions at trial, this Court may address plain errors or defects that affect substantial rights even if not noticed in proceedings below. V.R.Cr.P. 52(b); *State v. Mecier*, 145 Vt. 173, 178, 488 A.2d 737, 741 (1984). Such errors occur only in rare and extraordinary cases, *State v. Ayers*, 148 Vt. 421, 426, 535 A.2d 330, 333 (1987), and will be found only where failure to recognize the error would result in manifest injustice. *State v. Pelican*, 160 Vt. 536, 538-39, 632 A.2d 24, 26 (1993). The jury instruction for the mental element of felony murder to which defendant objects is as follows:

> The term intentional, as it is used in the second essential element, requires the State to prove that the killing of Glenn Michelson was not done by accident, but with intent to kill. Intentional means willful, in other words, you must find that the defendant intended to kill Glenn Michelson, and that the killing did not happen by mistake, inadvertence, or accident.

> You may also find the defendant intended to kill Glenn Michelson, if you find that the defendant by his actions intended to do great bodily harm to Glenn Michelson, *or that the defendant had a wanton disregard that his behavior would likely cause death or great bodily harm to Glenn Michelson.*

(Emphasis added.) According to defendant, this instruction was "virtually identical" to the instruction given regarding the criminal negligence element of involuntary manslaughter:

> Criminal negligence to support a conviction of involuntary manslaughter must be proved as the taking of a risk of such a nature and degree, that the defendant's failure to perceive it, considering the nature and purpose of his conduct, and the circumstances then known to him, involve a gross deviation from the standard of care that a reasonable person would observe in the same situation.

> Recklessness requires a wanton disregard for human life. In order for conduct to constitute either recklessness or criminal negligence, it must involve a high degree of risk of death, or serious bodily injury.

Defendant claims that these instructions allowed the jury to convict him of felony murder on a standard that permits conviction of involuntary manslaughter.

Vermont's felony-murder statute provides that "[m]urder committed . . . in perpetrating or attempting to perpetrate . . . robbery or burglary [ ] shall be murder in the first degree." 13 V.S.A. § 2301. The statute does not define the word "murder," and it does not illustrate the requisite mental element necessary for felony murder. This Court has stated that the mental element required is "an intention to kill, an intention to do great bodily harm, or *a wanton disregard of the likelihood that one's behavior may naturally cause death or great bodily harm.*" *State v. Doucette*, 143 Vt. 573, 582, 470 A.2d 676, 682 (1983) (emphasis added). Use of this language was explicitly reaffirmed in *State v. Johnson*, 158 Vt. 508, 518, 615 A.2d 132, 137 (1992); see also *State v. Bacon*, 163 Vt. 279, 291, 658 A.2d 54, 63 (1995) ("the mere showing that a person intended to commit one of the felonies enumerated in § 2301 is insufficient to convict the person of felony murder; at minimum, the prosecution must show a mental state of wanton disregard for human life with respect to the murder itself"), *cert. denied*, — U.S. —, 116 S. Ct. 117 (1995). Because the district court's instructions were in accord with the language in *Doucette, Johnson,* and *Bacon,* there was no error.

*Affirmed.*