2009 VT 79

## State of Vermont v. Peter L. Kulzer

[979 A.2d 1031]

No. 07-075

Present: **Reiber, C.J., Dooley, Johnson and Burgess, JJ., and Davenport, Supr. J., Specially Assigned**

Opinion Filed July 24, 2009

---

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Charles S. Martin* and *Peter Abbarno* (On the Brief) of *Martin & Associates*, Barre, for Defendant-Appellant.

¶ 1. **Johnson, J.** Defendant appeals his conviction following a jury trial for second-degree murder. On appeal, defendant raises two issues. First, defendant argues that the trial court erred by allowing a witness for the prosecution to comment on his invocation of the privilege against self-incrimination set forth by the Fifth Amendment to the United States Constitution and Chapter I, Article 10 of the Vermont Constitution. Second, defendant contends that the trial court committed plain error by failing to

instruct the jury regarding the lesser included offense of voluntary manslaughter. We affirm.

¶ 2. Viewed in the light most favorable to the jury's verdict, the record reveals the following facts. Defendant lived with his son in Readsboro, Vermont. The victim was defendant's son's close friend and lived nearby.

¶ 3. According to defendant's son's testimony, his relationship with his father was tumultuous due to his father's shifting views on the military. Defendant's son joined the Army in 2002 with his father's encouragement and was deployed in Iraq from February 2003 until March 2004. At home on leave, defendant's son learned that his father no longer supported the war, and the two began to argue over his military service.

¶ 4. Defendant's son received an honorable discharge from the Army in September 2004. By mid-February 2005, he had returned to Readsboro to live with his father. He testified that being a civilian for five months made him realize that he missed his military career. When he learned that the victim had enlisted in the Marines, he was eager to enroll as well through the buddy system. On March 12, 2005, he shared with defendant his plan to join the Marines. This disclosure precipitated angry yelling, with defendant exclaiming that his son was "committing suicide." That evening defendant's son spent the night at the victim's home.

¶ 5. On March 13, 2005, defendant's son and the victim enjoyed a leisurely afternoon playing video games. The two friends headed to defendant's home to retrieve a particular game. The victim drove, and he waited in the car while defendant's son went inside. Once inside, defendant's son encountered his father and reiterated his intention to join the Marines. Defendant then brandished a pistol at his son. Defendant's son started walking outside, and defendant, with the gun in his hand, followed. Defendant's son reached the car and started to open the passenger-side door. Defendant warned him not to enter the car and then shoved his son, who stumbled into a snow bank. Defendant's son testified that he then heard the victim exclaim, "No, no, no!" followed by a gunshot.

¶ 6. Defendant's son managed to wrest control of the gun from his father, and defendant retreated into his home. In a state of hysteria, defendant's son telephoned the victim's father and then dialed 911 from his cellular phone. Because defendant's son informed them that defendant owned many guns, the paramedics,

fearing another violent altercation, would not approach the scene. Although the victim was finally transported for medical care, the nineteen-year-old later died from his wounds.

¶ 7. Given the circumstances, the police also proceeded cautiously. One officer testified that he telephoned defendant's residence from the police barracks. Defendant answered the telephone, and, after stating his name and title, the officer said, "I heard there had been some trouble out there." The officer further related that defendant "advised he didn't want to talk to me about it." The officer's testimony did not describe defendant's repeated statements to the effect that the only person he would talk to was his lawyer.[1] The ostensible purpose of the telephone call was to ensure the safety of the police, other emergency responders, witnesses, and defendant. The officer, therefore, instructed defendant how to exit his home and surrender to the police, who were on their way to arrest him. Subsequently, defendant was arrested and read his *Miranda* rights without further incident.

¶ 8. Defendant did not testify at trial, and from the trial's beginning, the defense objected on constitutional grounds to any testimony regarding defendant's purported invocation of his privilege against self-incrimination during the telephone call with the police officer. On October 25, 2006, the defense filed a motion in limine to exclude certain evidence, including "[a]ll evidence that [d]efendant declined to speak to police about the alleged incident, invoked his right to counsel, and remained stoic or silent throughout the time he was with the police." Nevertheless, on November 3, 2006, the court made a preliminary ruling to allow the State to

---

[1] The jury heard the following exchange between the officer and the prosecutor:

Q: [W]hat do you say?
A: I said, Peter? [A]nd there was a response, and I said, [t]his is . . . the State Police.
Q: Okay. And did you get any sort of response from that?
A: Not that I recall.
Q: What did you say next?
A: I just advised that I heard there had been some trouble out there.
Q: And did he respond to that?
A: [H]e advised he didn't want to talk to me about it.

elicit testimony from the officer regarding defendant's invocation of the privilege during their conversation.[2]

¶ 9. Later that same day, however, the trial court revisited its decision to allow the officer to testify as to the entirety of his telephone conversation with defendant. The court asked the State for a proffer, and the State requested that the officer be allowed to describe his conversation with defendant — save for defendant's statements regarding talking to his lawyer. Defendant, for his part, expressed his belief that such testimony would impermissibly be "commenting on his invocation of [the privilege]" and would penalize him "for . . . exercis[ing] [his] constitutional rights." Ultimately, the court accepted the State's proffer. It allowed the prosecution to elicit limited testimony from the officer who spoke with defendant over the telephone. See *supra*, ¶ 7 n.1. According to the trial court, because defendant was not under arrest or otherwise in custody at the time he purportedly invoked his privilege against self-incrimination, the State could introduce the officer's testimony. The court, however, precluded the prosecutor from commenting on defendant's telephone conversation during closing argument.

¶ 10. Defendant was convicted of second-degree murder, and this appeal followed. On appeal, defendant presents two claims, which we address in turn.

## I.

¶ 11. Defendant contends that the trial court erred in allowing the prosecution to elicit testimony from the police officer regarding defendant's invocation of his privilege against self-incrimination. Neither the federal constitution nor the Vermont Constitution permits such testimony, defendant argues.

---

[2] Specifically, the trial court ruled:

> [T]here can be testimony from the officer simply that [defendant] said he didn't wish to talk to him and felt he wanted a lawyer . . . . The Court will be open to jury instructions at the end of the case as to a person's right to invoke his . . . constitutional rights and would even be open at the time the officer testifies to a possible instruction to the jury, if asked[,] that a person has the right to invoke his constitutional rights. But I will not prohibit the State from asking, basically, as to [defendant's] sort of silence about anything up to that point and . . . that he simply made that response when asked if he wanted to say anything.

¶ 12. We note first that, contrary to the State's assertion, our decision in *State v. LaCourse*, 168 Vt. 162, 716 A.2d 14 (1998), is not controlling on the facts of this case. In *LaCourse*, we summarily held that, absent arrest or custody, a defendant's privilege against self-incrimination does not apply under either constitution. *Id.* at 166, 716 A.2d at 16. The defendant in *LaCourse* was tried for perjury. During the course of the trial, the prosecution elicited testimony from a government investigator who had called to question the defendant. There is no indication in the case that the defendant's arrest was imminent at the time of his conversation with the investigator. The investigator testified that the defendant refused to answer his questions and said that he " 'should talk to [my] lawyer.' " *Id.* We found no error in the trial court's decision to admit this statement into evidence. *Id.* Here, unlike in *LaCourse*, defendant's arrest was imminent. In fact, the purported reason for the officer's telephone call was to tell defendant that the police were on their way to his home to arrest him and to instruct him on how to surrender safely. Thus, although both cases technically involve pre-arrest, pre-*Miranda* silence, we cannot say that *LaCourse* is controlling.

¶ 13. Nor is there controlling federal precedent. The United States Supreme Court has not ruled on this issue. See *Jenkins v. Anderson*, 447 U.S. 231, 236 n.2, 238 (1980) (concluding that the prosecution may use a defendant's pre-arrest, pre-*Miranda* silence for impeachment purposes but explicitly withholding judgment on the issue of whether such silence may be used in the prosecution's case in chief where the defendant does not testify). The United States Courts of Appeals are split. The First, Sixth, Seventh, and Tenth Circuits have ruled that the federal constitution prohibits the prosecution from making substantive use of a defendant's pre-arrest, pre-*Miranda* silence. See *Combs v. Coyle*, 205 F.3d 269, 283 (6th Cir. 2000); *United States v. Burson*, 952 F.2d 1196, 1201 (10th Cir. 1991); *Coppola v. Powell*, 878 F.2d 1562, 1568 (1st Cir. 1989); *United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1018 (7th Cir. 1987). The Fifth, Ninth, and Eleventh Circuits, however, have ruled to the contrary. See *United States v. Oplinger*, 150 F.3d 1061, 1067 (9th Cir. 1998); *United States v. Zanabria*, 74 F.3d 590, 593 (5th Cir. 1996); *United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991).

¶ 14. Our sister states that have considered the issue are likewise divided. A significant number have ruled, on either state

or federal constitutional grounds, that the state may not introduce such silence during its case in chief. See *State v. Moore*, 965 P.2d 174, 180-81 (Idaho 1998) (Fifth Amendment prohibits prosecution from introducing, in its case in chief, and for the sole purpose of implying guilt, evidence of a defendant's failure to appear at scheduled police interview); *Commonwealth v. Thompson*, 725 N.E.2d 556, 565 (Mass. 2000) (concluding that where the defendant does not testify, federal constitution prohibits the prosecution from eliciting testimony during its case in chief regarding the defendant's pre-arrest, pre-*Miranda* silence); *State v. Rowland*, 452 N.W.2d 758, 763 (Neb. 1990) (holding that federal constitution does not permit state to use pre-arrest silence to imply guilt and characterizing the state's argument to the contrary as "nothing short of incredible"); *State v. Remick*, 829 A.2d 1079, 1081 (N.H. 2003) (holding that "use of pre-arrest silence in the case-in-chief . . . is unconstitutional"); *State v. Boston*, 663 S.E.2d 886, 896 (N.C. Ct. App. 2008) ("[W]e hold that a proper invocation of the privilege against self-incrimination is protected [by the Fifth Amendment] from prosecutorial comment or substantive use, no matter whether such invocation occurs before or after a defendant's arrest."); *State v. Leach*, 2004-Ohio-2147, ¶¶ 1, 9, 807 N.E.2d 335 (holding that substantive use of pre-arrest silence is contrary to Fifth Amendment); *State v. Palmer*, 860 P.2d 339, 349-50 (Utah Ct. App. 1993) (holding that admission of testimony during prosecution's case in chief "implicating defendant's decision to remain silent" is impermissible under federal constitution); *Taylor v. Commonwealth*, 495 S.E.2d 522, 529 (Va. Ct. App. 1998) (stating that policies underlying privilege against self-incrimination support conclusion that Virginia's constitution prohibits the state from using a defendant's pre-arrest silence as part of its case in chief); *State v. Easter*, 922 P.2d 1285, 1291-92, 1293 (Wash. 1996) (en banc) (reasoning that weight of authority and purpose of privilege support holding that Fifth Amendment bars the state from making substantive use of pre-arrest silence); *State v. Fencl*, 325 N.W.2d 703, 710 (Wis. 1982) ("We hold that the protections of the Fifth Amendment do extend to pre-*Miranda*, prearrest silence."); *Tortolito v. State*, 901 P.2d 387, 390 (Wyo. 1995) (holding that state constitution prohibits substantive use of pre-arrest silence). This view is not universal, however. See *State v. Leecan*, 504 A.2d 480, 484 (Conn. 1986) ("[P]re-arrest silence under circumstances where one would naturally be expected to speak may be used either as

an admission or for impeachment purposes. . . . We can perceive no violation of any constitutional right, state or federal, in our continued adherence to these rules."); *People v. Schollaert*, 486 N.W.2d 312, 315 (Mich. Ct. App. 1992) (neither federal nor state constitution prohibits the "admission as substantive evidence of testimony concerning a defendant's silence before custodial interrogation and before the *Miranda* warnings have been given"); *State v. Helgeson*, 303 N.W.2d 342, 347 (N.D. 1981) ("We subscribe to this view because the silence of a defendant following arrest and at trial involves the defendant's exercise of his constitutional privilege under the Fifth Amendment. These reasons are not applicable in a pre-arrest context when the defendant is silent in response to an accusation which he naturally would be expected to deny.").[3]

¶ 15. We need not reach the merits of defendant's argument, however. Assuming, without deciding, that it was error for the court to allow the prosecution to elicit testimony during its case in chief regarding defendant's pre-arrest, pre-*Miranda* silence, we hold that such error was harmless.[4]

¶ 16. In criminal cases, we evaluate the harmlessness of claims of constitutional error according to the same standard we use for nonconstitutional errors, see *State v. Carter*, 164 Vt. 545, 555, 674 A.2d 1258, 1265 (1996), and we will affirm a guilty verdict where

---

[3] Still other states have proscribed the substantive use of pre-arrest, pre-*Miranda* silence on state evidentiary law grounds, reasoning that such evidence has scant probative value and a substantial prejudicial effect when used to prove guilt. See, e.g., *Mallory v. State*, 409 S.E.2d 839, 842-43 (Ga. 1991), *overruled on other grounds by Clark v. State*, 515 S.E.2d 155, 159 (Ga. 1999); *People v. DeGeorge*, 541 N.E.2d 11, 12 (N.Y. 1989); *State v. Pigg*, 743 P.2d 770, 771 (Or. Ct. App. 1987).

[4] In light of this holding, we also do not address the merits of an additional, related argument put forth by defendant, except to say the following. Defendant asserts that it was improper to admit the officer's testimony under Rule 512(a) of the Vermont Rules of Evidence, which states, in pertinent part: "[t]he claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel. No inference may be drawn therefrom." Rule 512(a), however, overlaps with the constitutional privilege against self-incrimination and "extends some of the procedural protections that have been applied to the self-incrimination privilege to [other evidentiary] privileges." Reporter's Notes, V.R.E. 512. Therefore, to properly address defendant's argument we would first need to determine whether the privilege had attached at the time of defendant's telephone conversation with the police officer. But, as explained above, we do not reach this issue and express no opinion with respect to it.

we determine that the error was harmless beyond a reasonable doubt, see *id.* at 553-55, 674 A.2d at 1264-66.

■ ¶ 17. Where, as here, a defendant asserts that the trial court erred in admitting a witness's testimony that the defendant invoked his privilege against self-incrimination, we "assess harmlessness by considering the likelihood of the conviction in the absence of the offending testimony." *State v. Oscarson,* 2004 VT 4, ¶ 31, 176 Vt. 176, 845 A.2d 337. Two factors are of particular importance to our harmless-error inquiry: (1) the overall strength of the State's case against the defendant, considered apart from the offending testimony, and (2) the strength of the offending testimony. *Id.* ¶ 32; see also *State v. Lipka,* 174 Vt. 377, 385, 817 A.2d 27, 34 (2002) ("The two most important factors in the harm equation we must employ are the strength of the prosecution's case without the offending evidence and the strength of the offending evidence."). For purposes of this analysis, we ask, in essence, whether the outcome of the trial would have been different had the testimony not been admitted. See *State v. Lynds,* 158 Vt. 37, 42, 605 A.2d 501, 503 (1991).

¶ 18. Although defendant did not specifically address whether the error was harmless, he argues that the State's case was built primarily on the testimony of his son, the only witness to the shooting, and that the physical and forensic evidence implicating him was lacking. Largely due to delay in attempting to gather such evidence, the police were unable to identify any fingerprints on the murder weapon. Nor were the police able to identify fingerprints on the victim's vehicle. The clothes worn by defendant at the time of the shooting tested negative for gunshot residue. An examination of defendant's and his son's hands also did not reveal gunshot residue.

¶ 19. But defendant's son's detailed account of the crime, and the history of familial enmity that preceded it, coupled with his father's statements to him at the time of the crime, presented a consistent theory of the case that defendant was the perpetrator. No evidence suggested that defendant's son, the only other potential perpetrator, had any motive to shoot his best friend, with whom he wanted to serve in the Marines. Moreover, physical and forensic evidence corroborated at least part of his story of his struggle with his father over the gun after the shooting. That struggle was consistent with a wound on defendant's son's hand.

Defendant's son also testified that he fired the gun into the ground in order to uncock it. The chamber of the murder weapon contained two expended cartridges. He further testified that the victim was shot from close range, which expert testimony confirmed. Moreover, the State presented the testimony of numerous witnesses attesting to defendant's son's contemporaneous distress over the loss of his best friend and his repeated assertions at the time of the telephone calls to 911 and the victim's parents that defendant committed the murder. Our assessment of this factor weighs in favor of finding harmless error.

¶ 20. Turning to the strength of the offending testimony, we note that the cumulative nature of the testimony significantly diminishes its strength. As but one means of supporting its proposition that defendant, and not his son, shot the victim, the State introduced other witnesses to provide evidence regarding defendant's consciousness of guilt. Before the jury heard the police officer's testimony about defendant's refusal to talk to him, the victim's father and mother both testified that defendant remained in his home and made no efforts to assist them and others on the scene, including defendant's son, while they attempted to tend to their son's wound. The State later introduced the offending testimony of the police officer. Finally, the State called defendant's brother as a witness. Defendant telephoned his brother after the shooting but before he was arrested. During this telephone conversation defendant said, "I [won't] be living here anymore[;] you and the boys come over and take what you want, good-bye." We agree with the State's argument on appeal that "[a]ny inferences the jury might have drawn from [the officer's] testimony would have been no stronger or different from those which they would have drawn from the other evidence in the case" tending to show consciousness of guilt. Thus, taking into consideration the cumulative nature of the offending testimony, the second factor also weighs in favor of finding harmless error. See, e.g., State v. Burgess, 2007 VT 18, ¶ 11, 181 Vt. 336, 917 A.2d 528 (finding harmless error where erroneously admitted testimony merely cumulative).

¶ 21. Finally, the officer's testimony was part of a longer series of questions on direct examination regarding the circumstances leading up to defendant's arrest. The prosecution did not reference defendant's invocation of the privilege in its closing argument, and there was no further comment on the issue. Thus, we

are faced with a materially different set of facts from those analyzed by the United States Supreme Court in *Chapman v. California*, 386 U.S. 18 (1967), and *Anderson v. Nelson*, 390 U.S. 523 (1968), where extensive comment on inadmissible evidence precluded a finding of harmless error, *Chapman*, 386 U.S. at 24-26; *Anderson*, 390 U.S. at 525.

¶ 22. In sum, the cumulative nature of the offending testimony and the fact that defendant was the only potential perpetrator convince us that the outcome of the trial would not have been different had the officer's testimony been excluded. We conclude, therefore, that the error was harmless beyond a reasonable doubt.

II.

¶ 23. Defendant also argues that the trial court committed plain error because its jury instructions did not include a voluntary manslaughter charge. See *State v. Doleszny*, 2004 VT 9, ¶¶ 9-10, 176 Vt. 203, 844 A.2d 773 (stating that this Court will review objections to jury instructions only for plain error when objection was not made at trial after judge read preliminary instructions). Our standard for plain error is high. Only when a failure to recognize error would result in a miscarriage of justice or affect substantial rights will we find plain error. *State v. Schreiner*, 2007 VT 138, ¶ 36, 183 Vt. 42, 944 A.2d 250.

¶ 24. Generally, in criminal trials, the defendant is entitled to have the jury instructed on all lesser included offenses, "if the facts in evidence reasonably support such an instruction." *State v. Delisle*, 162 Vt. 293, 301, 648 A.2d 632, 637 (1994); see also V.R.Cr.P. 31(c).[5] Because voluntary manslaughter is a lesser included offense of murder, defendant asserts he was entitled to such an instruction because evidence set forth at trial could reasonably be construed as indicating that the "killing [was] committed under extenuating circumstances that would mitigate, but not justify, the killing." *Delisle*, 162 Vt. at 301, 648 A.2d at 637-38 (quotation omitted). Defendant argues that his strained relationship with his son and his son's statement about joining the

---

[5] V.R.Cr.P. 31(c) reads: "Conviction of Lesser Offense. The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense."

Marines, coupled with the alleged physical altercation at the time of the crime, support a voluntary manslaughter instruction.

¶ 25. For defendant to be entitled to an instruction on voluntary manslaughter, the facts must have showed "(1) adequate provocation; (2) inadequate time to regain self-control or 'cool off'; (3) actual provocation; and (4) actual failure to 'cool off.' " *State v. Turgeon*, 165 Vt. 28, 32, 676 A.2d 339, 342 (1996), *overruled on other grounds by State v. Brillon*, 2008 VT 35, ¶ 42, 183 Vt. 475, 955 A.2d 1108 (quoting 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.10, at 255 (1986)).[6]

¶ 26. The facts adduced at trial fail to meet the first and third elements of voluntary manslaughter in that there was no adequate provocation or actual provocation by the victim. First, "mere words will not justify a physical attack." *State v. Bogie*, 125 Vt. 414, 417, 217 A.2d 51, 55 (1966). Second, even if defendant were actually provoked by his son's statement that he intended to join the Marines, defendant's attack was on a person sitting in a car who had not said anything to defendant or provoked him in any way. See *Schreiner*, 2007 VT 138, ¶ 39 (reasoning that defendant was not entitled to a manslaughter jury instruction because defendant did not "point to any confrontation between herself and the victim"); *State v. Trombly*, 148 Vt. 293, 302, 532 A.2d 963, 969 (1987) (crime of voluntary manslaughter requires attack against one's assailant), *overruled on other grounds by State v. Tahair*, 172 Vt. 101, 109-10, 772 A.2d 1079, 1085-86 (2001). The only physical altercations occurred when defendant shoved his son out of the way before the shooting and when his son struggled with defendant after the shooting. These altercations add nothing to defendant's provocation argument because they did not involve the victim, and it is therefore unnecessary to consider whether defendant had an adequate time to regain his composure.

¶ 27. Therefore, the trial court did not err, let alone commit plain error, when it failed to instruct the jury on voluntary manslaughter.

*Affirmed.*

---

[6] *Brillon* overruled *Turgeon* on the issue of a defendant's right to a speedy trial. *Brillon*, 2008 VT 35, ¶ 42 (overruling *Turgeon* and similar cases "to the extent that they suggest that demonstrating actual prejudice at trial is a prerequisite in . . . finding a speedy-trial violation under the United States Constitution").